Good morning, your honors. My name is Steve Mishuda for the Petitioner Northwest Resource Information Center. I'm going to try and reserve five minutes of my time for rebuttal this morning. Congress created the Northwest Power and Conservation Council for two reasons. First, to restore salmon and steelhead that had been devastated by the dams on the Snake and Columbia Rivers, and second, to ensure the continued reliability of the region's power system. Thirty years after Congress declared those two purposes, and declared that salmon restoration in particular was an urgent priority, the Columbia River continues to generate enough power, but it's not generating enough salmon. Just the opposite. Most of the river's salmon runs have been driven onto the list of endangered species during that time. This Court has in the past found that the Council failed to achieve the Act's dual power and salmon goals, but we're back here before the Court today because the Council's sixth plan continues its 30-year failure to do what the Power Act requires. There are three reasons that I'll touch on this morning why this plan violates the Northwest Power Act. First, the Council failed to provide any independent due consideration to the needs of salmon in the Power Plan. Second, the Council adopted exaggerated estimates of the costs of salmon protection, and third, the Council failed to take an objective look at the environmental costs and benefits of the various power resources available to the region. Turning to my first point, that the Council failed to provide due consideration to the needs of salmon, this is a question, excuse me, of statutory interpretation. While the Council agrees with us that this provision imposes substantive obligations, it's pushing a reading of the statute that renders it meaningless. How the due consideration duty fits into the fabric and context of the Act is important to understanding its context and its meaning. In our prior opinion, I think that was also starring your client. Yes. We made a difference between the section of the statute involving the program and the section of the statute involving the plan. And with respect to the plan, we basically said our deference to the agency is pretty much boundless. In stark contrast, we said to the deference for interpreting the program. So now we're looking at the language of the statute relating to the plan, and it seems like under that rule, the deference we give to the Council's expertise would be very broad, and we'd really have to find that their interpretation was unreasonable based on the plain language of the statute. So I'm having a little trouble doing that. It seems like they have your interpretation certainly is reasonable, but it certainly seems their interpretation is reasonable. So why are we compelled not to defer to their interpretation? Your Honor, I think you've hit on the major point in the due consideration issue. Their interpretation is not reasonable because it reads out the due consideration mandate from the from the power plan, and I'll maybe walk through that very quickly. Our contention is that their interpretation is unreasonable and therefore deserves no deference from this Court. The due consideration mandate comes at the end of the power planning process, and the language that the due consideration mandate uses is that the Council has to give due consideration to an adremis fish, including flows of adequate quantity and quality, and for successful spawning and migration, and including salmon habitat. That language does in fact mirror other language in the Act. The first place that it mirrors is in the goals of the Act. Again, one of the primary goals of the Act is act as fish restoration. In the development of the Fish and Wildlife Program, the other main decision that the Council makes, that language appears there as well, and in the power plan process, in order for the Council to come back and look at those same factors again, it didn't do it just merely to be redundant, but the interpretation that the Council is asking this Court to adopt renders it redundant, renders it superfluous, because they're saying as long as we incorporated the 2009 Fish and Wildlife Program in our decision and thought about how it impacts things, we're fine on the due consideration mandate. So they, if I understand the argument, sort of simplified, but they're saying as they determine how the operations will run, how they look at their conservation measures and the development of resources, they take into account the requirements, limitations, etc., that have been developed through the program. So why isn't that a reasonable interpretation of their obligation? Because that exercise is already required by two different provisions in Section 4 E3, which is the one that comes after the due consideration provision. That section says the Council has to make power decisions based on what it found in the Fish and Wildlife Program, and also says, in a separate provision, that the Council has to include the Fish and Wildlife Program in the power plan. Are you talking about power forecasting, that section? Yes. I wasn't sure whether that was the same enterprise as what was discussed there. That seemed to be something that was extended in a different way. Maybe you can explain that. Yeah, the power forecasting duty of the Council and the plan ends up being, more or less, one of the major things that it does. What it's doing is looking out 20 years into the future and saying, what are the power demands that the region is going to have, and how are we going to meet those power demands with what, with And so the consideration of the Fish and Wildlife Program, in that central task, is really bringing in everything that we know from the Fish and Wildlife Program itself into the power plan, and then considering how it impacts how we allocate power, where we're going to get the power from. And so, again, I think that's the... Power forecasting, in your view, you're saying that's the same as implementing conservation measures and developing resources? Yes, that's, well... Is that what you're saying? Implementing conservation resources and developing renewable resources and other things is what you do after you've forecasted the power. So first you need to know, kind of, what we need going forward in terms of how much energy does the region need, both to meet future demand and, as a matter of fact, to meet the needs of salmon. How much new energy does the energy, does the... And then it goes and looks at the various measures and ways that we can get that energy. But isn't the point that the due consideration for fish and wildlife applies for future resources, right? Not existing, not the existing hydro system. What authority do you have that the due consideration requirement applies to existing... Well, in the, in the power plan, and I don't actually think there's a lot of... There's, there is a debate about whether the environmental costs and benefits methodology, and that is one of our arguments in this case, applies to new or existing. But in the power plan, the council is looking not only at developing new resources, it's also deciding whether and how much to carry forward its existing resources. So there are two, there are really two decisions going on there, and I don't think there's... Conservation, are you saying implementing conservation measures? I thought that was just reduction of consumption. That is, yes. No, I'm saying, you know, we have... Because the two things they're supposed to do is implementing conservation measures and developing resources, and so developing resources sounds, as Judge Gilman was noting, especially with the cross-reference, that they are developing, considering what resources to develop in the next however many years, I guess five years of the planning process. So what part of that, where do you say analyzing their current existing system fits in? Well, so there's nothing, there is nothing in the plain language of this provision that requires them to only look at new resources. Due consideration, again, is a broader, it's a much broader... Developing resources necessarily implies future. Well, and conservation necessarily implies kind of looking backwards as well, because it's looking at conserving what we have. So really, again, it's the whole portfolio that's in front of the council. The definition was reduction of consumption, which seems like at the use end, not at the generation end. That's right, but that, of course, reduction of consumption at the use end reduces the need to generate as well. Do you have any case authority that says that the due consideration requirement applies to the existing hydro system? Unfortunately, this is an area that is not, has not yet been before this court. And so the due consideration requirement, as far as I'm aware, is raised for the first time in this case. The answer is no. That's right, Your Honor. Yes. However, I will say that there is no authority that limits it the other way either. And again, when you look at the context of this provision and the importance that Congress placed on Salmon, the fact that it put this due consideration mandate into the power planning process indicates that it's something more than just going forward with what decisions we've already made. It's a look back or a check-in, so to speak. So this gets to my concern, which is now we're at the interpretation of the statute phase. And so in that context, you make eloquent arguments about why it should be interpreted one way, but we're bound to defer to the council. Well, again, if the council had put forth a reasonable interpretation that didn't make this meaningless, we might be talking about deference. But again, the only thing the council has pointed to in its main argument is that its consideration of the 2009 Fish and Wildlife Program is adequate to satisfy the due consideration mandate. Again, if that were the case, we wouldn't need this mandate. The consideration of the program and the consideration of the program's impact on the power plan are already required by Section E3, the next section down. And so we wouldn't need this. Congress wouldn't have said, go back and give due consideration to these very specific factors regarding Salmon restoration if we didn't need to do that because we've already incorporated the Fish and Wildlife Program. In other words, it's a recognition that we may not have perfect knowledge at the time that we adopt a Fish and Wildlife Program, and that after the power planning exercise, at the point at which the council is integrating these two things together to produce the end result that the act requires, it's an admonition to the council to go back and make sure that we're doing everything we can in order to protect salmon. What you say makes sense, but is the council required to do that, or would it just be maybe good policy they did? But what makes them legally obligated? Well, the provision of the statute. Again, the council shall give due consideration to these factors affecting salmon. That's a mandatory requirement. And again, it's one that they didn't do in this sixth power plan. Could you also discuss the argument that you briefed, that the council didn't appropriately circulate its methodology? And in particular, could you address the question whether that error is harmless, which is what they're arguing? They concede that it wasn't recirculated, but they said any error is harmless. So you're absolutely correct that they didn't circulate any methodology. And we might be having a different discussion today if there was any indication in the power plan itself, how the council applied a methodology, if it even applied a methodology. We don't have any place or indication in the power plan itself that it applied. The current plan incorporates the methodology. I think they met the statutory requirement to incorporate a methodology. As I understand it, the only error is they didn't circulate it for public comment. That is correct. They put it in after public comment. In our most recent case on this, after Shinseki v. Sanders, or Sanders v. Shinseki, I always get that mixed up, Cal Wilderness said that the challenger has the burden of showing that the failure to circulate for public comment is prejudicial. So maybe you could address, because I didn't see that in your briefs, how you were prejudiced by the failure to circulate. Well, in very short answer, the Act requires that the council inform and involve the public in the development of the plan. Without telling the public what it's doing, the public doesn't have an opportunity to comment on or in any way influence that methodology. So, yes, the methodology was added to the plan at the end of the process, after someone in the process pointed out, you don't have a methodology in your plan, where is it? The council added it, but then we didn't have another, you know, it's not like there was another round of discussion to talk about either the adequacy of that methodology or the application of it. So in this case, we're saying the methodology was tacked on at the last minute, and it is harmful, because it does have impacts, and we don't know in the power plan how or where it was applied. And this gets into... And so what is the prejudice? I mean, obviously, if they didn't circulate it for comment, you didn't have the opportunity to comment on it. But I think that in order to show harm, there has to be something more than that. Well, and I think our argument here, Your Honor, is that there is harm, because the methodology that they've expressed, A, we don't know if it was applied or how it was applied, and B, the methodology itself is flawed. It doesn't look at all of the environmental costs and benefits of the different power resources in the region, and it doesn't provide a methodology for doing so. And our recourse was to come to this Court to make that argument. Again, maybe that would be different if we had gone through another process below. Very briefly, and very related to this, I wanted to touch on our arguments about the inclusion of Bonneville Power Administration's cost estimates in this plan. In its estimates of costs annually, Bonneville includes, as a cost, all of the money that it could have generated at the dams if it weren't required to comply with fish provisions. Now, Bonneville calls that foregone revenue, but it's really important to recognize it for what it is, because it's really a fiction. I could clearly make more money if I sold my clients real estate that didn't belong to me, but I don't do that because it's illegal. So the plan reports on what BPA says. This is what I didn't understand. I didn't see how the Council relied on that for any agency decision. And we've said unless the agency actually relies on the irrelevant information in reaching its decision, then we don't strike it down. It's not considered arbitrary and capricious. So explain to me how the Council relied on BPA's statement. So first and foremost, I think that begs the question of why the Council included it at all. If it's really irrelevant, it doesn't have any place, doesn't belong in the power plan. And the reliance on that statement and the harm to our interests is that going forward, those numbers, because they're included in the power plan, get repeated by the Council in its annual reports to the governors, in the public discussion. As Bonneville admits in its brief, those numbers play a role in the next round of Fish and Wildlife Program amendments. They play a role in the regional debate around what we should do to protect salmon. But the decision before us here, which is what is on appeal and we're looking at, did the agency rely on those numbers for any part of its decision making? Well, Chapter 6 of the power plan is all about the reliability of the power system. And those numbers get repeated as costs. So is that a no? They didn't rely on it, is what you're saying? I believe they did, Your Honor. And on what decision relied on that, just so I understand? Well, the Council has to decide whether at the end of the day there's an economic and reliable power system. Despite its position to this Court that it didn't rely on those numbers, those numbers play a role in whether or not the power system is economical. Clearly, if the fish costs were 20 times higher than what they really are, that would impact the economical power supply. It may not impact the reliable power supply, but it certainly has effects on the economics of the power supply. Your issue is that the draft version of the plan had a much lower estimate, right? Around $300 million? It did, yes, Your Honor. It did. And it recognized that these costs weren't necessarily relevant. Because, again, it's making the assumption that you could violate the law and you get credit for not violating the law. Again, just as I can't ask the IRS to allow me to claim as a loss all the money that I didn't make selling my neighbor's house, Bonneville can't claim as a loss all the money it didn't make because it was required to provide for salmon and not drive them to extinction. Do you want to save time for the rebuttal? I do, Your Honor. Thank you. Thank you. Good morning, Your Honors. May it please the Court. My name is John Schertz, and I'm the General Counsel for the Northwest Power and Conservation Council. I'll be using 15 minutes of my time. Ms. Ginsberg, who is representing the intervener Northwest River Partners, will use the last five minutes. And if I could have a reminder of just about a minute before I'm done, I would appreciate it. I will try. But watch the clock. I will. So our position can be reduced to just one basic point that arches over all, and that is this case is entirely about statutory construction. The statute is clear, and the counsel's understanding of it is reasonable. Sections 4D through 4G of the Northwest Power Act are clear in telling the counsel how to engage in power planning and what goes into the final power plan decision. By the explicit language of Sections 4D and 4E, the power plan is a resource strategy for developing new generating resources and implementing conservation measures. All the elements in the consideration in the Act, in the course of developing the power plan, need to be understood within the framework of a counsel decision on what is a new resource strategy. And that's the decision called for in the sixth power plan. Counsel followed the statute faithfully in the sixth power plan as the counsel did for the previous five over the last 30 years. So opposing counsel says that that language would be redundant if it didn't mean something more than what you just described. So the language, the due consideration language that's in Section 42, does have meaning, and it has two meanings. And the counsel has always given it these meanings. The first is that the counsel does have to analyze the effects on generation from the power system of what are the flow and passage measures that come from the preceding fish and wildlife program decision. We need to know what the effects of those on the power plan are. They're an input, because you need to know the generation that comes from it so that you can develop a resource strategy that not only meets load, but can reliably deliver those fish and wildlife measures, those flow measures. The second thing it means is when we are analyzing what new resource options there are to put into the power plan, we need to know what the potential effects on fish and wildlife are of these new resource options, whether it be wind, gas, coal, or whatever, and then understand the cost of those effects. And that's what the counsel did in the sixth power plan. And is that redundant of the requirement to do power forecasting or of including the program? We don't think it's redundant. Power forecasting, what you need to do is understand what are the potential demand forecasts. The statute in 4E3 requires us to do a demand forecast for the next 20 years. It requires us to do an assessment of what is the output of the existing system. And these are one of the outputs of the existing power system or what comes from hydro generation. But you need to analyze the effects of the flow measures. But the decision then made is a resource strategy that allows you to deliver those flow measures reliably by adapting the power system, filling the gaps, if there's a reduction in hydro generation. The decision asked for is a resource strategy that allows that to happen reliably. And if you walk over in the statute to section 6, which is what the power plan guides as Bonneville's resource acquisitions, one of the requirements of Bonneville in section 6 is that it requires resources consistent with our plan that allow it to implement the Fish and Wildlife Program. The Fish and Wildlife Program is a decision that comes first before we do the power plan. It's a final decision subject to review. It's an input. It's those flow measures are now one of the many, many, many, many technical inputs into the council's power planning process. The output, the decision, is the resource strategy. So in a sense, that's what the council did here. It decided in 2009 on the amended Fish and Wildlife Program decision measures based on recommendations of the Fish and Wildlife Agencies and Tribes. This court was rather clear in 1994 in the first NRIC decision that the council in its Fish and Wildlife Program decision making is a very explicit statute with very specific substantive and procedural requirements. One of those requirements is a requirement that we give substantial deference to the recommendations of the agencies and tribes as we do our Fish and Wildlife Program. We did that in the 2009 program. It was a final decision. The petitioner neither participated in nor challenged the council's 2009 Fish and Wildlife Program. No one challenged that decision. Right, but what they're saying, as I understand it, is that after you adopted the 2009 program for Fish and Wildlife, now you're generating the sixth power plan. You find out that, hey, conservation will meet much of the future demand more than you had anticipated when you did the 2009 program. So now, why not incorporate additional Fish and Wildlife provisions? So in the sixth power plan, we did make a decision that the resource strategy for the next 20 years was heavily weighted toward conservation. Yeah, what, 86% or 85%? In doing that, we analyzed the inputs from the Fish and Wildlife Program to make sure that they were appropriately met and could be reliably delivered even as we adapted the power system with conservation and new generating resources. What it would be peculiar to do, in our view, is to read the new consideration provision to require the council to revisit the outcome of the Fish and Wildlife Program in the power plan, bypass the recommendations of the agencies and tribes, and independently introduce into the power plan resource strategy a different set of flow and passage measures. I have no idea where would they come from, what would the record be, how would it relate to a final decision made based on the recommendations of state and federal Fish and Wildlife agencies and tribes in the Fish and Wildlife Program as to what are the appropriate measures for fish and wildlife on the river. We don't see a decision coming out of the sixth power plan where we would say, here's a different set of flow measures that are now the operable flow measures. The decision is a power plan, a resource strategy, that will allow you to deliver those flow measures reliably. And that's a substantive decision. It's more than just simply including the program in the power plan. It's how you develop your resource strategy to allow this to happen and be delivered as adequately and reliably as you deliver load. And that's the work that we do in the power plan. So your basic position is that this due consideration requirement isn't retroactive then? In our view, and I guess the way to put it, due consideration does not mean to revisit. It does not mean to look back and re-decide what are the official flow and passage measures that are appropriate for fish and wildlife. That has happened already in decisions elsewhere. The power plan is taking those decisions elsewhere and adapting the power system to make sure that the power system remains whole and even as you deliver different operations on the river for fish and wildlife. The petitioner may differ about whether those are the right things to do on the river for fish and wildlife. And there are plenty of opportunities in the fish and wildlife program, in a continuing jurisdiction case on what's the right ESA requirements. There are many places to participate in what are the right decisions about salmon. The power plan is not the place. The power plan is not about salmon policy. It's about doing the right resource strategy. So when you say the plan shall set forth a general scheme for implementing conservation measures and developing resources with due consideration for these items, do I understand you correctly? You say it means you're adapting the power system to take into account the program requirements and these other factors? Correct. Is that correct? We're taking into account, we're using the power system to make sure that we're using the power plan to make sure the power system can deliver what are the requirements that are developed elsewhere as well as meet load. It's one of the inputs, of many inputs, into doing a 6 Northwest power plan. One other provision, if you read the due consideration provision, it also requires us to make sure the new resource strategy is compatible with the existing power supply system. We understand the existing power supply system as another input that we're trying to adapt as time goes on to make sure you meet load and to make sure as you are changing that power system where you need to in your fish and wildlife program decisions, you can make sure the resource strategy keeps us whole in the region. Can you also address this public comment on the methodology? Although NRIC has the burden of showing prejudice, we've set that bar very low and said that a mistake in the notice and comment process is harmless only when it clearly had no bearing on the procedure used or the substance of decision reached. And here, opposing counsel suggests that had the methodology been circulated, they could have pointed out areas in which it was flawed or didn't meet the statutory requirements. So, your honors, I have two answers to that. The first one being that, as we said in a brief, and this is why the way it played out, we were very clear what our methods were, how we do the environmental costs and benefits of new resources. We were very clear in the draft power plan what the new methods were. We had spent months, in particular, arguing about how to apply a cost to carbon in terms of carbon emissions from new resources and other costs. What we didn't do was write the explicit methodology down in the program and identify it in the draft as this is the methodology we use. The methods were clear. They had been discussed with others, both at the council and public, and, in fact, in a series of interactions with a number of the participants. It's not in the plan itself, though, is it? The methods were clear. The methods were even in the plan. The draft plan describes how we would evaluate the environmental costs of resources, including how we applied across the board to a set of resource scenarios, different ranges of carbon cost emissions, different ranges. We also include the regulatory costs of environmental compliance for every resource that's in the plan. In the plan, we did that work. We didn't write the methodology in the draft. It was a mistake. We did immediately get pointed out in comment. We got pointed out in comment on the comment in the power plan, we don't see your methodology. We didn't get comment saying, we don't understand your methods. We didn't see your methodology. We corrected that in the final plan. That's what notice in comment is for. My second answer to it, though, is if you read the petitioner's arguments, they're arguing for a methodology that we don't think the statute simply allows. It's a methodology where you would look at the existing hydro system resources and decide what is the environmental costs and benefits of that existing hydro system resource and then make some sort of decision with that. Frankly, I don't know what that decision would be. The decision in the power plan is what are the new resources to bring compatible with the existing system. That's what the methodology is about. When I looked at the methodology you added to the plan after the comments, it wasn't clear to me how that met the statutory requirement that you need a method for determining quantifiable environmental costs and benefits under Section 839-84 which seems to reference some cost effectiveness type method. As I understood, to simplify what you had provided, it was well, we think that environmental costs are already incorporated in the regulatory requirements which didn't seem like a method for determining quantifiable environmental costs and benefits. Can you explain that to me? Yes, Your Honor. The methodology it's first off, the way what you have to be able to do is determine what are quantifiable environmental costs and benefits directly to the resource. What we have done is in most cases the environmental costs have been captured in a regulatory requirement. The regulatory requirement itself doesn't give the costs. You then have to know what those costs are. You have to look at, say, if one of the resources in your stack is a coal plant, there are certain regulatory compliance costs you need to build into your cost structure as you're doing your cost effectiveness comparison of these things. There are some costs that have not yet been captured or can't be captured simply by looking at regulatory costs. The classic example in the Sixth Power Plan, and frankly where we end up spending most of our time and not probably on the rest of the environmental costs, were putting a cost in carbon emissions. There is no regulatory scheme that allowed a cost in carbon emissions. We don't have a regulatory scheme in particular. We had to figure out some way to apply an environmental cost and benefit calculation here. What the Council did in the end was look across the landscape of a range of carbon costs, carbon taxes that could represent what would be the directly attributable costs to the environment of carbon emissions. We recognize that regulatory costs may not give you the full range of environmental costs and benefits. Beyond that, there's very few that are probably quantifiable. When you are faced with a situation like that, yes, in fact, we did have to figure out how to quantify those costs. We did it with carbon emissions. There is a method there. It's a difficult one to do if you think about it. It's a provision of the Act that was very much about trying to internalize externalities. It clearly was an error and you admit it was an error. It's just a question of whether it was harmless or not. We believe in particular it's not harmless because the argument from the petitioner is a statutory argument. I believe it is harmless. It's an argument from the petitioner that's a statutory argument about whether or not you would take that methodology and apply it to existing hydro system resources. The statute simply would not allow that. What about the last issue about this BPA cost estimate that's much higher than what you had in the draft plan? Our answer to that is in the brief and here again. It's informational purposes only. People want to see what those costs are. It's important to some people. They differ over what those are. At the end of the day rather than the council trying to even say what they are, we simply reported the way Bonneville reports fish and wildlife costs and we made it very clear both in the power plan in the statement of basis of purpose and in our brief. We did not rely on that information. There is no provision of the Act that would include that information. Why include it then? We include all sorts of information. Why did you omit what you had in the draft plan of the much lower estimates? Because we got back in comment from people that they were not happy with the range of ways the council was trying to articulate the costs. We realized as a staff and as a council it was a diversion. We simply reported how Bonneville did it because people wanted to see it. Well the NRIC is very unhappy with the BPA estimates. They can have other forums to work with BPA on that. The power plan resource strategy did not use that information. It has no relevance to the power plan resource strategy and it is... Well does the plan does your plan have any note that this is all irrelevant information? It does in fact we have said both in the plan in the statement of basis and purpose that we adopted with the power plan we said explicitly that. We do not use this information in making the resource strategy and it is not part of the power plan. It is there for informational purposes only. And I want to leave some time for Ms. Ginsberg so I do want to just finish with this point that I think Judith began with with the petitioner and that is we think the statute is clear and we think we can resolve this simply on statutory construction but the extent the court sees there is any room for ambiguity or interpretation in 1986 this court said in the Seattle Master Builders case that the council the court will defer to the council's reasonable understanding of the statute. We believe our understanding is reasonable and we would ask the court to uphold it and the court should deny the petition. Thank you. May it please the court. My name is Beth Ginsberg. I'm with the law firm of Stolbreeze and I'm going to be presenting argument this morning on behalf of the Northwest River Power Northwest River Partners and the Public Power Council. In the three minutes and 27 seconds that I have I'm going to try to make some points that I think would help given the questions that the panel has asked this morning. There is a reason why petitioner's argument should not be accepted. And why the council's argument is not only reasonable, it is the argument that doesn't render other provisions of the statute a nullity. And let me just say that their interpretation of the due consideration phrase in section 4E negates the process, the deference to and the finality of the Fish and Wildlife Program that Congress established under section 4H. Let me tell you how. Due consideration cannot mean that the council takes a second look. I agree with Mr. Schertz on that. Or revisit the issues that were previously decided under the program. Because they were decided under the program under a formal rulemaking process. While Mr. Mishuda insists that there's no other way to imbue the due consideration phrase under 4E with meaning to not render it superfluous, he's simply mistaken. Section 9E1 accords finality to the adoption of the program by the council and any determination that the council makes under section 4H. Congress also established a 60-day statute of limitation and prohibited the Fish and Wildlife Program as finally adopted from being challenged as part of any other action. That means there can be no collateral attacks on the program. And that's exactly what Mr. Mishuda and his clients are doing in attempts to get a second bite at the apple, having failed to previously participate in that rulemaking process. So to overcome this problem, they present their case in a sly way. They're saying we're not asking the council to second guess or necessarily unilaterally amend the final rulemaking. We're asking them to at least commence amendment proceedings. But to imbue the due consideration phrase with a mandatory duty to commence amendment proceedings is simply another way to negate the finality that Congress accorded the program under section 9E. And certainly while the council retains the discretion to amend its previously adopted program, the petitioners attempt to transform that inherent discretion into a mandatory duty that negates the program's finality. That can't be what Congress meant. In addition, section 4E2 has to be harmonized with the very prescriptive process that Congress established under 4H. This is the rulemaking process. 4H requires the council to not only solicit the views of the agencies, the state, the federal, and the tribal, and the wildlife managers, but to develop that program based on their input under a formal rulemaking process. Congress also directed the independent scientific research panel and scientific peer review groups appointed by the National Academy of Science to assist. Now in this previous NRIC case that this court decided, the court held that it's the council that is required to defer to these managers. As you said before, Judge Ikuda, the council has very little discretion in this area. In contrast, it has a great deal of discretion in the power planning process because the court recognized that it's these nationally recognized fishery managers who collectively have the expertise to determine how best to set flows. And that the council is not an uber fish agency. They don't have this kind of expertise to take a second look. They have to give a high degree of deference to the managers in the state, in the federal system, in the tribes, who know what's best for fish. The council's discretion to second guess this is very, very limited. But these petitions are now asking this court to disregard the statute and this court's prior ruling to sanction and run around that process and to run those national and state and local and tribal experts. They're hoping for more spill, for more flow, and for other measures that these petitioners and their attorneys and their allies are seeking in other fora. Other fora that we're all involved in, including challenges to the biological opinion pending in the district court in Oregon. You're over time now, so please wrap up. Well, for that reason and others that we've  counsel to deny the petition and to adopt the reasonable interpretation provided by the council. Thank you. Your Honors, I'll return to the issue of deference very, very quickly. Mr. Schertz noted that the council has always understood the Power Act to require the same thing that it's done here. As we noted in our briefs in the first two power plans, the council noted, and this is a quote, that due consideration was quote, in addition to the acts mandate that the council adopt a fish and wildlife program, end quote. So in both of those power plans, the council then went on to perform a separate analysis of due consideration for salmon and for environmental concerns and to make power resource decisions based on those analyses, not just relying on the fish and wildlife program. And in paragraph 3, the council noted that the central task of the fish and wildlife program and the power plan was to come together to produce the result Congress intended. And as part of that, it noted when someone suggested that we do some hydro system measures that would improve salmon during the fish and wildlife program, it said, we're going to hold those and consider those as part of the power plan. Those fish protection measures are integrally tied up with power and we'll consider those fish protection measures in the power plan. There's no bar in the act to considering fish protection measures in the power plan itself. There's no bright line between fish and wildlife and power planning. In fact, Congress did everything it could to make sure that we were blurring those lines. So whatever the process and procedure the council has followed, the result is what matters. And just to respond briefly to the River Partners argument, we're not saying that they have to go back and amend the fish and wildlife program. We're asking that the court direct them to ask the questions that the act requires. Are we doing enough for salmon? Are we meeting the act's goals? If the answer to those questions are no, in fact, we've learned that we can do more and that there are measures that we can take to do more, then it's up to the council to decide whether that requires going back and amending the program. They certainly have the authority to do that, but they're not required to. Again, in the power plan itself, the council can make decisions about the allocation of power that can do things like set up different amendments for the power plan if need be, or it can make those decisions in the power plan, excuse me, in the fish and wildlife program if need be, but it can make those decisions in the power plan itself as well. So there's nothing that we're arguing that says they have to revisit these issues and they have to go back and do it all over again. Thank you, Your Honors. Thank you. We thank both council, or all council, for their arguments in the case of Northwest Resource Information Center versus Northwest Power and Conservation Council is submitted.
judges: Alarcon, Gilman, Ikuta